CRAM *v.* MITCHELL and others.

STORM and others *v.* MITCHELL and others.

A. M., an insolvent merchant in New-York, made a general assignment of all his property, giving preferences to L. A., residing in Philadelphia, and J. H. and H. H. residing in New-York. The property assigned, and nearly all the creditors, were in the city of New-York. L. A. and J. H. were brothers-in-law of M.; H. H. was the son of J. H. The three assignees were the first preferred creditors. L. A. in consequence of his distant residence, made N. his agent in New-York, to look after his interests. J. H. was blind. H. H. was illiterate, could write only his name, and could not read writing except with difficulty. It was *held,* upon these circumstances, that the assignment was made with the intent to defraud creditors.

The law tolerates voluntary assignments giving preferences, and permits the insolvent debtor to select his own assignees; but it requires that they shall be competent, and of sufficient character and pecuniary responsibility, to insure the execution of the trust, for the benefit of those interested. And where the debtor selects for assignees, three relatives, of whom one is incapacitated by his residence, one by blindness, and the third by his want of education, from executing the assignment, it is evidence of an intent on the part of the assignor to keep the control of the property in his own hands, or to appropriate it for his own use and benefit.

The household furniture of the assignor was left in his possession for eleven months, without sufficient explanation; *held,* that this was also evidence of fraud.

The agent of L. A. one of the assignees, and a preferred creditor, was active in getting up a sale of certain leaseholds which were assigned, and became the purchaser of the same at a very inadequate price. *Held,* that if he were ignorant of the fraud in the assignment, he was nevertheless not a *bona fide* purchaser; because as the agent of L. A. a creditor, and in a measure the agent of the assignees, he had a duty to perform in regard to the property sold, which was inconsistent with his becoming the purchaser. And his purchase was set aside, together with the assignment, as fraudulent against the creditors of the assignor.

Nov. 7 and 8, 1843; January 27, 1844.

THE suit of Cram was a creditor's bill, founded on a judgment at law against Abraham Mitchell, on which an execution had been returned unsatisfied. L. Allen, J. Hart, and H. Hart, were made parties as the assignees of Mitchell, he having made a general assignment to them for the benefit of his creditors, on the 25th of May, 1841,

The bill charged that the assignment was made with the intent to hinder, delay and defraud the creditors of Mitchell. It also charged that J. B. Nones, one of the defendants, had become the purchaser of certain chattels real, which were a part of the property assigned ; with notice of the fraud, and under circumstances which equity would not sanction. And the bill prayed that the assignment, and the sale to Nones, might be declared fraudulent and void as against the complainants ; and that the property assigned might be applied to the payment. of their debt and costs.

The material facts upon which the case turned, are stated in the opinion of the court. The suit of Storm and others was similar in all respects, except that Nones was not made a party. The suits were heard together.

*J. S. Bosworth,* for the complainants.

*S. B. H. Judah,* for the defendants.

THE ASSISTANT VICE-CHANCELLOR.—The general assignment executed by Mitchell to Louis Allen, Joseph Hart, and Henry Hart, is alleged to be fraudulent against the creditors of Mitchell ; and two leading features in the case are principally relied upon, as furnishing evidence of the fraudulent intent of the assignor.

One is the selection of the assignees, their situation, and character. The other is the management of the assigned property.

1st. The assignment makes Allen the first preferred creditor ; Joseph Hart the second ; and Henry Hart the third. The amount of their debts is not stated. Allen and Joseph Hart were the brothers-in-law of Mitchell. Henry Hart is the son of Joseph. Allen was a merchant, residing in Philadelphia. He constituted the defendant, Nones, his attorney to look after his individual interests under the assignment. This power, and the incompetency of the other assignees, gave to Mr. Nones a preponderating influence in the management of the estate. Joseph Hart was blind, and had been blind for many years. He is

proved to be a man of sound judgment, and capable of advising in the disposition of the property. But he was so far secluded, that, when the subpœna to answer was served in this suit, his son Henry refused to suffer access to him, on the ground that he was blind and not permitted to be seen. Henry Hart is very illiterate. He can write no more than his name, and it is left in doubt whether he can read. When the subpœna to answer was served on him, he handed it to a clerk to see what it was. By his silence in his answer, he admits the truth of the charge, that he is incompetent to make up an account of the estate, and to keep the accounts. (*Rule* 17.) He is shown to be an active man, and in other respects, competent to take charge of business.

The law in this state tolerates voluntary assignments, made by insolvent debtors, giving preferences to their confidential or favorite creditors. It also permits the debtor to select the assignee who is to execute the trust, without the consent of his creditors, and even without consulting a single creditor. Learned judges throughout the Union have first combated, and then deprecated the sanction of such assignments. And it was with much doubt and difficulty, that entire latitude in the selection of the trustee was finally conceded to the assignor.

The case of *Burd* v. *Smith*, (4 Dallas R. 76,) in the court of errors and appeals of Pennsylvania, well illustrates the progress of this concession. *Smith*, J., in delivering his opinion against the validity of the assignment in that case, says, "No debtor has a right to make his own trustees, and the very attempt would, under some circumstances, be considered as an act of bankruptcy. In a conflict between the debtor and his creditors, the trustees would generally prefer his interest," &c. And *Brackenbridge*, J., gives as one of his reasons for holding the deed of trust void, "that the trustees were appointed by the grantor himself." *Rush*, J., says he cannot conceive any thing more dangerous than to sanction by a judicial determination, a deed by which a man plunged in debt, suddenly and secretly, without the knowledge of a single creditor, conveys to trustees of his own nomination, an immense property, on such terms, and in such manner as he has chosen to prescribe.

The force of Judge Smith's reasoning on this point in *Burd* v. *Smith,* is exemplified in the disposition of the assets under the assignment in question, as will presently appear.

When the law was established, that the failing debtor might select his own assignees, it did not concede to him the right to vest his estate in improper or unworthy persons.

It reasonably required of him, that his assignees should be men qualified, and competent to discharge the duties of the trust which they were to assume, and of sufficient character and pecuniary ability, to afford the assurance that the trust would be honorably and faithfully administered.

In *Reed* v. *Emery,* (8 Paige's R. 417,) the chancellor decided that an assignment to an assignee, who was known to be insolvent, was *prima facie* evidence of an intent to defraud the creditors of the assignor. If an assignment were made to an infant, or to a married woman, it would strike the mind at once, as an abuse of the privilege accorded to debtors, and as indicative of a design to defraud. So if a failing debtor, whose property was all situated in this city, and whose principal creditors resided here; should make an assignment to three merchants residing in Boston, and who, although creditors of the assignor, could not give their personal attention to the management of the trust; without some satisfactory explanation, it would be apparent that the assignor had created a necessity for a substitution in the conduct of the estate, which would be likely either to give him the control of the assets, or to afford him opportunities to retain and appropriate them to his own use.

In the case before me, the only assignee who appears to have been competent to act as such, was precluded by his distant residence, from taking any active part in the execution of the trust. The property was here; here it was to be collected, sold, converted into money, and applied to the debts. Here the accounts were to be kept. Allen lived in Philadelphia. So conscious was he of the impossibility of his acting efficiently in the matter, that he delegated the care of his own interest to Nones. If he would take that course for his own protection, it needs no argument to convince me, that the same course was necessary for the protection of the fund for the benefit of others.

It cannot be pretended that either Joseph or Henry Hart separately, or that both of them together, could properly manage the assignment. Joseph Hart could do nothing. True, he could give advice on a case stated to him ; but practically it would be of no moment, because founded upon the representations of others, as to qualities, circumstances, &c., which he was not capable of knowing or ascertaining. Better advice could be had at will, of competent men who could both see and know.

As to Henry Hart, one of the earliest duties of an assignee, is to ascertain the extent and particulars of the assigned property. In this case there was no inventory annexed to the assignment. His first business as assignee, was to make, or cause to be made, an exact inventory of the assets. Again, a primary duty of every trustee is to keep an account of his trust. How could this assignee, who could not keep accounts, who could not write except his name, and probably could not read writing ; make an inventory, or know that an inventory or account made by others, was correct or true. In these particulars, Joseph Hart could not aid Henry. Both combined, fall short of making one competent assignee. Then take the three assignees together. Situated as they were, they were not all equal to one proper and capable trustee. Allen's capacity in Philadelphia, would not remedy or supply the incapacity of the Harts here. and the result is, that unless Allen were to change his residence, which was not contemplated, the assignment was to vest the estate in three persons, who when all their qualities were combined together, could not carry on the trust, and could not discharge the offices which the law exacts from a single competent trustee.

The effect of such an assignment as this, was manifestly to throw the management of the property into the hands of irresponsible agents, or to keep it within the control and disposition of the assignor. And the selection of the near relations of the debtor, placing them all before other creditors in the schedule of preferred debts, demonstrates that the latter was the motive of the act.

I cannot resist the conclusion upon the circumstances, that the assignment was intended to hinder and delay or defraud creditors.

2nd. Entertaining this view of the first point, it is not necessary to dwell upon the subject of the disposition of the trust estate. It certainly corroborates the inference of fraud. The household furniture was suffered to remain in Mitchell's possession without change, for nearly a year after the assignment. The excuse for this, is the claim set up by Warner, by virtue of the mortgage executed by Mitchell the same day that the assignment was made, but prior to the execution of the latter.

If, as the assignees contend, the mortgage was fraudulent, the case is not relieved. It was a contemporaneous act of the assignor, and tends to show that the assignment was fraudulent also. Nor does it appear that the assignees made an effort to obtain the possession of the goods till the end of the year; nor that they could not have taken them as well in May, 1841, as in April, 1842.

The sale of the leaseholds to Nones, was a striking instance of the consequences of permitting the assignor to select his trustee, as well as the selection of such trustees as those named in this assignment. Without imputing fraud to him in the purchases, such a result indicates improper action in the assignment which led to it.

3rd. The remaining question in this cause relates to the sale and transfer of those leaseholds to Nones.

Without stopping to inquire whether, under the circumstances, Nones was chargeable with notice of the fraud in the assignment, there is a well settled and valuable principle of equity which will not permit this transfer to stand. No person can become the purchaser of an interest in property, where he has a duty to perform which is inconsistent with the character of a purchaser.

*Greenlaw* v. *King*, (5 Lond. Jur. Rep. 18,) before Chancellor Cottenham; *Tanner* v. *Elworthy*, (4 Beav. R. 487;) *Van Epps* v. *Van Epps*, (9 Paige's R. 237 ;) *Torrey* v. *Bank of Orleans*, (9 id. 663.)(*a*)

***

(*a*) See *Campbell* v. *Johnston*, ante p. 148 ; and *Dickinson* v. *Codwise*, ante p. 214.

In this case, Nones was the agent of the principal assignee in his capacity as the first and largest preferred creditor. He was active in getting up and conducting the sale, and he became the purchaser at a very inadequate price. It cannot be disguised that he was in this transaction at least, the agent of the assignees.

I speak now of instituting and carrying out the sale of the leaseholds. His duty in reference to Allen as a creditor, and more especially in reference to the assignees and creditors at large, was to make the leaseholds produce as much as possible. His interest, as a purchaser, was to bid off the property at the lowest possible price.

It is no answer to the argument to say that this suit is adverse to the assignment itself, and that those claiming under the assignment do not complain.

It being shown that the assignment was fraudulent, Nones can only be protected in his title derived under it, by establishing that he is a *bona fide* purchaser ; and the circumstances of his purchase, to which I have adverted, prove that he cannot be regarded as such in this court.

There must be a decree declaring the assignment of Mitchell to be fraudulent and void as against the complainant. And that the sale and transfer of the leaseholds to Nones, were invalid against him. And if necessary to the payment of the complainant's debt and costs, Nones must transfer to the receiver, and account for his purchase to that extent.

In other respects, there will be the usual decree.

The same decree will be entered in the case of Storm and others, against Mitchell and his surviving assignees, except that as Nones is not a party, there will be no direction in regard to the leaseholds.